UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

DIANA LYNN ROWLEY,

    Plaintiff,

v.

KATHLEEN G. WHITKANACK,

    Defendant.
                                                /

Case No. 04-00094

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [38]**

On July 3, 2001, Plaintiff Diana Lynn Rowley and Defendant Kathleen G. Whitkanack collided at a highway intersection in South Haven, Michigan. Apparently, Defendant ran a stop sign and "T-boned" Plaintiff's automobile. As a result of the accident, Plaintiff has suffered ongoing health problems. Plaintiff argues that under Michigan's no-fault insurance scheme, Defendant is liable for Plaintiff's noneconomic losses because Plaintiff has "suffered a serious impairment of body function." Defendant moves for summary judgment. For the reasons discussed below, the Court GRANTS Defendant's Motion.

**I.    Facts**

    **A.  Extent of Plaintiff's Injuries**

Immediately after her accident with Defendant on July 3, 2001, Plaintiff was transported to a local emergency room and was diagnosed with cervical and lumbar spinal strain. (Pl. Br. at 1; Def. Br. at 4.)[1] She was discharged that evening with a soft collar neck

---

[1] Both Plaintiff and Defendant have failed to cite record evidence for the majority of the assertions they make in their briefs. In fact, some of their statements are entirely

brace and pain medication. (Pl. Br. at 1; Def. Br. at 4.) Plaintiff alleges that she returned to the same emergency room two days later, on July 5, 2001, due to significant neck pain and headaches. (Pl. Br. at 1.) Her cervical spine was again examined with X-rays that showed no fracture and only mild cervical changes at the C4/C5 level that could be related either to ligamenteous injury or patient positioning. (Pl. Ex. 1.) At this time, Plaintiff also underwent a MRI of her cervical spine, which was negative for both cord compression and disc herniation. (Def. Ex. A.) The MRI demonstrated a mild disc bulge at C6/C7, loss of normal cervical lordosis, and minimal kyphosis at C4/C5. (Pl. Br. at 1; Def. Br. at 4.)

Defendant alleges that Plaintiff did not see her primary physician, Richard Allan, until August 14, 2001, and his examination revealed a "good" range of motion with a diagnosis of whiplash. (Def. Br. at 5.) Plaintiff alleges that she received chiropractic treatment during July of 2001 and physical therapy in August of 2001. (Pl. Br at 2.)

After her automobile accident, Plaintiff sustained two work-related injuries. On September 24, 2001, she was struck on the left side of her face with an air hose, resulting in a bruise. (Def. Ex. B.) She was discharged to work with no work restrictions. (*Id.*) On February 14, 2002, Plaintiff twisted her back lifting a tote onto a cart, resulting in a diagnosis of a back injury--a left serratous interior strain. (*Id.*) Plaintiff returned to work with restrictions of no lifting over five pounds, minimal bending and twisting and no leaning forward to one side. (*Id.*) She was released from these restrictions on February 22, 2002. (*Id.*) In her deposition testimony, Plaintiff states that she cannot recall this injury. (Def. Ex. C at 54.)

---

unsupported by the evidence. Where the unsupported facts do not appear to be material or in dispute, the Court refers to the parties' briefs.

Eleven months after her automobile accident, on June 7, 2002, Plaintiff allegedly went to the emergency room complaining of severe headaches, shakinesss in both legs, numbness in her hands and difficulty sleeping. (Pl. Br. at 2.) Followup studies to this visit did not show physical abnormalities, however. On June 27, 2002, Plaintiff's MRI of her brain was normal (Def. Ex. E), and on June 29, 2002, Plaintiff's EMG (regarding her bilateral upper and lower extremity numbness and weakness) was normal. (Def. Ex. F.) At the referral of Plaintiff's primary care physician, Plaintiff saw an orthopedic specialist, Dr. John Ehlert, on July 20, 2002. (Def. Ex. D.) Dr. Ehlert found Plaintiff to have tenderness at the back of her neck, 75 percent range of motion in her neck, and a normal sensory and reflex exam in her upper and low extremities. (*Id.*) He reviewed her previous MRI and found a "tiny" disc bulge that he stated would not cause any of Plaintiff's symptoms of neck pain and headaches. *(Id.)* Dr. Ehlert concludes in his report that his review of the multiple previous studies demonstrates that Plaintiff did not have any structural abnormalities. (*Id.*) However, Dr. Ehlert states in his deposition that Plaintiff's symptoms at his examination could have resulted from a C4/C5 facet abnormality that he regarded at the time of examination as related to patient position not physical change. (Pl. Ex. 6 at 25.)

Plaintiff was next examined by an orthopedic surgeon, Dr. John Flood, on August 1, 2003. (Pl. Ex. 4.) Plaintiff described a sharp, throbbing constant pain in the center of her neck with radiation to the bilateral trapezial areas. (*Id.*) Dr. Flood diagnosed Plaintiff as having mild cervical spondylosis and chronic neck pain following a motor vehicle accident. (*Id.*) Dr. Flood did not find Plaintiff to be a suitable candidate for surgery, and he referred her for physical therapy. *(Id.)*

Almost a year later, on July, 26, 2004 Plaintiff again saw Dr. Flood, complaining of a constant, non-radiating pain in her neck. (*Id.*) Plaintiff reported that she had not previously attended any of the recommended physical therapy. (Pl. Ex. 4.) Dr. Flood referred her to a pain management specialist, Dr. Richard S. Ferro. (*Id.*)

On September 9, 2004, Dr. Ferro examined Plaintiff and diagnosed post-traumatic cervicalgia (neck pain) and post-traumatic cervical radiculopathy (radiating pain). (Pl. Ex. 5 at 13.) Dr. Ferro reviewed MRIs dated July 10, 2003 and noted mild bulging at both C4/C5 and C6/C7 discs. (*Id.* at 12.) Dr. Ferro testifies that in the absence of prior neck injury, he would relate his diagnosis with Plaintiff's automobile accident. (*Id.* at 24.) Dr. Ferro states that he is optimistic about Plaintiff's long-term prospects. (*Id.* at 25.) He further states, however, that although Plaintiff is not currently under any work restrictions because she is not employed, possible work restrictions associated with his diagnosis would include limiting bending, twisting, lifting, pushing, pulling and overhead work, with a weight limit between 5-25 pounds, for an indefinite period of time. (*Id.* at 24-25.)

### B. Changes in Plaintiff's Lifestyle

Plaintiff argues that the pain she continues to suffer from her 2001 automobile accident has resulted in her having to change her lifestyle. The lifestyle changes that Plaintiff cites include difficulty working, difficulty enjoying recreational activities, and difficulty helping with household chores. These are discussed below.

Plaintiff was 17 years old at the time of her automobile accident. Her most recent job had been as a receptionist at a beauty salon, where she worked approximately fifteen to twenty hours per week and made $6.25 per hour. Plaintiff states in her brief that while she

4

was employed at the salon for 4 to 6 months prior to the motor vehicle accident, she was terminated a few days prior to the accident (Pl. Br. at 7-8.)

Less than two months after her accident, Plaintiff started work as a welder and machine operator at L & W Engineering, where she made $9 per hour. (Pl. Br. at 8.) Although Plaintiff noted the July 3, 2001 auto accident during her pre-employment medical examination, she passed her pre-employment medical examination with no restrictions. (Pl. Ex. 11.) While at L &W she worked full time, with overtime twice a month. (Def. Reply Br. Ex. A.) Plaintiff resigned from L & W Engineering on July 31, 2002 for "personal reasons." She maintains, "I could only handle so much pain, and I just couldn't, I just couldn't take it anymore." (Pl. Ex. 7 at 144-45.) It does not appear, however, that the pain *itself* prevented her from working. Rather, it was her "continuously seeking medical treatment, [she] had doctor appointments and so forth . . . ." (*Id.* at 144.) She testifies that she had used too many "occurrence days" for these appointments, which were due to the pain from her automobile accident, and L & W offered her the option of resigning or facing termination. Plaintiff chose to resign so that she might be hired again in the future. (*Id.* at 143.)

Approximately two months after quitting her job at L & W, Plaintiff started working part-time at a Christmas collectible store for $5.75 per hour. (Def. Ex. C at 154.) She quit that job in October or November of 2002. (Pl. Ex. 7 at 155.) She claims in her brief that she quit "as a result of her pain, discomfort and inability to perform her job due the [sic] requirement that she be constantly standing upright while working as well as the physical demands of being required to stock shelves etc." (Pl. Br. at 9.) While Plaintiff cites

5

testimony that she experienced pain while working, she points to no evidence in the record that her decision to quit was related to the pain. (*See* Pl. Ex. 7 at 155.)

Plaintiff gave birth to a daughter on March 30, 2003. (Pl. Br. at 9.) She resumed working on August 3, 2003, as a store clerk earning $5.75 per hour. Plaintiff quit that job on May 13, 2004. She states in her brief that she quit "due to pain associated with her neck and back problems caused by her constant standing, repetitive labor and heavy lifting." (Br. of Pl. at 10.) She cites no evidence to support this contention.

In addition to discomfort while working, Plaintiff also points out that her pain limits her ability to do many of the hobbies that she used to enjoy before her accident, such as horseback riding, hunting, and fishing. Plaintiff testifies that she rode her horse "maybe once a month" after her automobile accident until her parents sold their horses. (Pl. Ex. 7 at 64.) Plaintiff also testifies that she has passed up family trips to Michigan's Upper Peninsula because she "couldn't sit in the car for that long, it's like an 11 hour drive, and we--I don't have the money to go." (*Id.* at 34.) She also states that her pain prevents her from diving off a swimming pool diving board, although she still gets in the pool. (*Id.* at 174.) When asked how the accident had changed her life, Plaintiff also noted that she "can't play on the volleyball team at the church, I can't play softball, I can't exercise." (*Id.* at 124.) Plaintiff's father, James Till, testifies that since Plaintiff's accident, she has rode her horses "very seldom," and she now goes fishing and hunting less often. (Pl. Ex. 10 at 19, 26-33.)

Finally, Plaintiff states that she is unable to help with some of her household responsibilities since the accident, such as washing her home's windows, making beds, washing laundry, and going by herself on large grocery trips. (Pl. Ex. 7 at 164-165.)

Plaintiff also testifies that she cannot give her daughter a bath without getting into the bath tub herself, and that picking up her thirty-three pound daughter causes pain in her shoulders and neck. (*Id.* at 167-69.) Plaintiff argues that this limitation impedes her ability to play with her child.

## II.   Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position

will not suffice. Rather, there must be evidence on which a jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Discussion

The Michigan No-Fault Act provides in part,

> (1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.
>
> (2) For a cause of action for damages pursuant to subsection (1) filed on or after July 26, 1996 , all of the following apply:
>
>> (a) The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
>>
>>> (i) There is no factual dispute concerning the nature and extent of the person's injuries.
>>>
>>> (ii) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement . . . .
>
> (7) As used in this section, "serious impairment of body function" means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life.

Mich. Comp. L. § 500.3135.

The Michigan Supreme Court has recently offered guidance to lower courts confronted with claims for noneconomic damages:

> The following multi-step process is meant to provide the lower courts with a basic framework for separating out those plaintiffs who meet the statutory threshold from those who do not.
>
> First, a court must determine that there is no factual dispute concerning the nature and extent of the person's injuries; or if there is a factual dispute, that it is not material to the determination whether the person has suffered a

8

serious impairment of body function. If a court so concludes, it may continue to the next step . . . .

Second, if a court can decide the issue as a matter of law, it must next determine if an "important body function" of the plaintiff has been impaired. It is insufficient if the impairment is of an unimportant body function. Correspondingly, it is also insufficient if an important body function has been injured but not impaired. If a court finds that an important body function has in fact been impaired, it must then determine if the impairment is objectively manifested. Subjective complaints that are not medically documented are insufficient.

If a court finds that an important body function has been impaired, and that the impairment is objectively manifested, it then must determine if the impairment affects the plaintiff's general ability to lead his or her normal life. In determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life. Once this is identified, the court must engage in an objective analysis regarding whether any difference between the plaintiff's pre-and post-accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his life. Merely "*any* effect" on the plaintiff's life is insufficient because a de minimus effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his life.

The following nonexhaustive list of objective factors may be of assistance in evaluating whether the plaintiff's "general ability" to conduct the course of his normal life has been affected: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery. This list of factors is not meant to be exclusive nor are any of the individual factors meant to be dispositive by themselves. For example, that the duration of the impairment is short does not necessarily preclude a finding of a "serious impairment of body function." On the other hand, that the duration of the impairment is long does not necessarily mandate a finding of a "serious impairment of body function." Instead, in order to determine whether one has suffered a "serious impairment of body function," the totality of the circumstances must be considered, and the ultimate question that must be answered is whether the impairment "affects the person's general ability to conduct the course of his or her normal life."

*Kreiner v. Fischer*, 683 N.W.2d 611, 625-26 (Mich. 2004) (footnotes omitted).

In a footnote to factor (d) above, the court noted, "Self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point." *Id.* at 626 n. 17.

*Kreiner* was a factually similar case,[2] and the Michigan Supreme Court's application of the Michigan No-Fault Act is helpful here:

> First, we find that Kreiner's medically documented injuries to his lower back, right hip, and right leg constitute an impairment of an important body function that was objectively manifested.
>
> Thus, the issue is whether the impairment affected his general ability to lead his life. We find that Kreiner's impairment did not affect his overall or broad ability to conduct the course of his normal life. In fact, his life after the accident was not significantly different than it was before the accident. He continued working as a self-employed carpenter and construction worker and was still able to perform all the work that he did before, with the possible exception of roofing work. His injuries did not cause him to miss one day of work.
>
> Kreiner states that he can no longer stand on a ladder for longer than twenty minutes, can no longer lift anything over eighty pounds, and was forced to limit his workday to six hours because he can no longer work eight-hour days. Kreiner does not contend, however, that these limitations prevent him from performing his job. He also has difficulty walking more than a half mile without resting and can no longer hunt rabbits, although he continues to hunt deer.
>
> Looking at Kreiner's life as a whole, before and after the accident, and the nature and extent of his injuries, we conclude that his impairment did not affect his overall ability to conduct the course of his normal life. While he cannot work to full capacity, he is generally able to lead his normal life. A negative effect on a particular aspect of an injured person's life is not sufficient in itself to meet the tort threshold, as long as the injured person is still generally able to lead his normal life. Considered against the backdrop of his preimpairment life, Kreiner's postimpairment life is not so different that

---

[2]*Kreiner* actually presented two companion cases. The unnamed Plaintiff, Straub, suffered injuries that were less similar to Plaintiff in the present case, and the court's analysis is therefore omitted as to Straub. This discussion focuses on Plaintiff Kreiner.

>his "general ability" to conduct the course of his normal life has been affected.

*Kreiner*, 683 N.W.2d at 628 (footnotes omitted).

Turning to the present case, there appears to be some dispute about the nature and extent of Plaintiff's injuries. For the reasons discussed below, however, any such dispute is immaterial to this case. Even assuming that "an important body function has been impaired, and that the impairment is objectively manifested," Plaintiff cannot show that "the impairment affects [her] general ability to lead . . . her normal life." *Id.* at 625-26.[3]

Plaintiff's evidence[4] of her changed lifestyle can be summed up quickly. Before her automobile accident, Plaintiff was unemployed. Afterwards, she began what she contends was the best job she has ever had. She later quit because she had used up too much leave time. Plaintiff spent less time riding horses, hunting, and fishing, although she continued to partake in these activities. She had difficulty taking prolonged road trips. She also experienced pain when she dove off of diving boards and could no longer participate on a volleyball or softball team. Her ability to do chores that require heavy lifting or repetitive motions are limited. Finally, she is limited in her ability to pick up her growing daughter or lean over to play with her and bathe her.

Plaintiff appears to argue that her pain limits her activities, thereby establishing the existence of a residual impairment. As the Michigan Supreme Court stated in the above-

---

[3] At oral argument on this Motion, Plaintiff conceded that if the Court found that Plaintiff's plaintiff's injuries had not altered her general ability to lead her normal life, any question about the extent of Plaintiff's injuries would be rendered immaterial.

[4] As noted above, the briefs contain many claims without citation to or support in the record.

11

referenced footnote in *Kreiner*, however, self-imposed restrictions due to residual problems do not suffice to prove that Plaintiff's residual impairment affects her general ability to conduct her normal life. *Id.* at 626 n. 17. The footnote was analyzed at length in a recent Michigan Court of Appeals decision:

> [T]he footnote can be construed as providing, "Self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish [the extent of any residual impairment]." The necessary corollary of this language is that physician-imposed restrictions, based on real or perceived pain, can establish the extent of a residual impairment . . . .
>
> We think it evident that our Supreme Court crafted footnote 17 in *Kreiner*, in the context of establishing the extent of any residual impairment, because the nature of pain tends to be subjective and therefore inherently questionable. While there may exist a medically identifiable or physiological basis for the pain, self-imposed restrictions because of pain, in and of themselves, fail because there is no medical expertise supporting the restrictions, which expertise would, in all likelihood, take into consideration the source of the pain before restrictions are imposed. That said, if there are physician-imposed restrictions based on real or perceived pain, footnote 17 does not require that the doctor offer a medically identifiable or physiological basis for imposing the restrictions.

*Lindsey v. Grinage*, 2004 Mich. App. LEXIS 2904, *4-5 (Mich. Ct. App. Oct. 28, 2004) (unpublished).

With this in mind, Plaintiff presents her treating physician's deposition testimony that he would, hypothetically, impose work restrictions on her:

> Q: I notice that you have not put Ms. Rowley on any formal restrictions, because I believe she's at home. But if she were to be placed on restrictions, what would they be?
>
> A: Typical spinal restrictions will limit bend, twist, lift, push, pull. And the neck area, that will also include overhead kinds of things . . . . I would probably put the weight limit somewhere around 15 to 25 pounds.

> Q: Okay. So, basically, restrictions to overhead, bending, lifting, twisting, and you wouldn't want her to do more than 10 or 15 pounds; is that correct?
>
> A: Roughly.

(Def. Ex. 5 at 24.) This evidence does not satisfy Plaintiff's burden.

First, her physician's "restriction" is a hypothetical one, as opposed to an actual one, and therefore does not offer the reliability and fact-specific application made necessary by the physician restriction requirement. More importantly, there is no evidence in the surrounding record that the physician's statement has anything to do with Plaintiff's alleged pain. Thus, the reasoning behind the Michigan Supreme Court's requirement of physician-imposed restrictions--to guarantee that allegations of pain are well-founded--is not satisfied by the hypothetical restriction Plaintiff offers as evidence.

Even if the physician's hypothetical work restriction was considered by the Court, however, it would not tip the balance of all objective evidence in favor of Plaintiff. The limitations that Plaintiff cites simply do not rise to the level necessary to withstand Defendant's Motion. As in *Kreiner*, Plaintiff's impairment "did not affect [her] overall or broad ability to conduct the course of [her] normal life. In fact, [her] life after the accident was not significantly different than it was before the accident." *Id.* at 628. This conclusion finds support in several Michigan Court of Appeals cases provided by Defendant, which have similarly found that minimal lifestyle changes and pain will not support a claim for noneconomic benefits under Michigan's No-Fault Act. *See*, *e.g.*, *Jacobs v. Provost*, 2004 Mich. App. LEXIS 2776, *10-12 (Mich. Ct. App. Oct. 21, 2004) (unpublished) (upholding summary disposition against the plaintiff where she "continued to work despite continuing pain in her neck and lower back," she could no longer camp or jet ski as she previously had

on occasion, and could no longer lift her grandchildren or perform "heavy housecleaning")*;* *Austin v. Corbin*, 2004 Mich. App. LEXIS 3360, *9-10 (Mich. Ct. App. Dec. 14, 2004) (unpublished) (upholding summary disposition against the plaintiff where the plaintiff continued participation in leisure activities "with some discomfort," and was "unable to perform household chores"); *Hewelt v. Hetherington*, 2004 Mich. App. LEXIS 3057, *6-7 (Mich. Ct. App. Nov. 9, 2004) (unpublished) (upholding summary disposition against the plaintiff where she continued working and "to garden, exercise, clean the house, and take care of her family, although with discomfort and assistance"); *Lindsey*, 2004 Mich. App. LEXIS 2904 at *4-5 (upholding summary disposition against the plaintiff where he had to take "more frequent rest breaks" and otherwise adjust his behavior, but was "able to engage in the activities in which he participated prior to the accident"). *But see McDanield v. Hemker*, 2005 Mich. App. LEXIS 2312, *18-19 (Mich. Ct. App. Sep. 27, 2005) (unpublished) (reversing summary disposition against plaintiff where her "injuries resulted in her being out of work approximately six to seven months, needing assistance from coworkers [upon return] . . . , having to forgo recreational activities . . . , significantly curbing her household chores [and] gardening activities, interfering with her sleep habits, decreasing intimacy . . . , and has resulted in years of visits to doctors for tests and treatments . . . , with a prognosis that she will have to continue such a regimen, in whole or in part, because she will most likely have pain for the remainder of her life").

    Plaintiff's evidence does not demonstrate that the accident changed the course of her life. Hence, as a matter of law she cannot show that she has a serious impairment of body function. Plaintiff actually initiated new employment in which she worked overtime after the accident. During her employment at the three jobs she held after the collision, she did not

receive a single physician's work restriction due to the injuries she suffered in the accident. She continued to enjoy the same activities that she used to enjoy, although in a diminished capacity. While she cannot pick her daughter up without pain, and cannot bathe her while leaning over, she continues to care for her. While she cannot perform all of the household chores she did prior to the accident without pain, she is still able to do light housework. The evidence does not support Plaintiff's contention that her alleged impairment affects her general ability to lead her normal life, at least as that phrase has been defined and interpreted by the Michigan Legislature and the Michigan courts.

## IV.  Conclusion

Even viewed in the light most favorable to Plaintiff, the evidence would not support a finding that the Plaintiff has suffered a serious impairment of a body function. Being fully advised in the premises, having read the pleadings, and for the reasons discussed above, the Court hereby GRANTS Defendant's Motion for Summary Judgment.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 23, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 23, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager